UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| HARPETH RIVER WATERSHED ASSOCIATION, ) ) ) | |
|        Plaintiff, ) ) | |
| v. ) ) | Case No. _____ |
| BERRY'S CHAPEL UTILITY, INC. ) d/b/a HARPETH WASTEWATER ) COOPERATIVE, ) ) | JURY DEMAND |
|   Defendant. ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF AND FOR CIVIL PENALTIES**

**I.  INTRODUCTION**

1.     This is a civil action brought pursuant to the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("the Clean Water Act"), to prevent the owner and operator of a sewage treatment plant from continuing to operate in violation of the Clean Water Act.

2.     Plaintiff Harpeth River Watershed Association ("Watershed Association") seeks a declaratory judgment, injunctive relief, civil penalties, and any other relief this Court deems appropriate to correct the recurring, unpermitted discharges of pollutants in violation of the Clean Water Act by Defendant Berry's Chapel Utility, Inc. d/b/a Harpeth Wastewater Cooperative ("Defendant"), which owns and operates the Berry's Chapel Utility Sewage Treatment Plant ("Sewage Treatment Plant").

3.     Defendant's past and continuing unpermitted discharges and permit violations have a significant impact on water quality, aquatic life, and human health, and have harmed and will continue to harm the Harpeth River and the interests of the Watershed Association.

## II.  JURISDICTION AND VENUE

4.      The Watershed Association brings this enforcement action under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365. This Court has subject matter jurisdiction over this action pursuant to 33 U.S.C. § 1365, 28 U.S.C. §§ 1331, 2201 and 1355, and it has personal jurisdiction over the parties.

5.      The Watershed Association has complied with the statutory notice requirements under § 505 of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.2 and 135.3. On January 13, 2014, Plaintiff provided Defendant with notice of the violations specified in this Complaint and of Plaintiff's intent to file suit after sixty days should those violations continue. This notice was effectuated by sending a letter ("60-day Notice") via email and certified mail to:

Berry's Chapel Utility, Inc.  
106 Mission Street, Suite 203-A  
Franklin, TN 37067

Mr. Tyler Ring, President  
Berry's Chapel Utility, Inc.  
106 Mission Street, Suite 203-A  
Franklin, TN 37067

Mr. John Ring, President  
Berry's Chapel Utility, Inc.  
106 Mission Street, Suite 203-A  
Franklin, TN 37067

True and correct copies of the 60-day notice letter and return receipts are attached and incorporated in their entirety by reference as **EXHIBIT 1**.

6.      The Watershed Association also sent a copy of the 60-day Notice to the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Regional Administrator of EPA Region 4, and the Commissioner of the Tennessee Department of Environment and Conservation ("TDEC").

7.       More than sixty days have passed since the letter was served on Defendant, as well as on state and federal agencies.

8. Upon information and belief, neither the EPA nor the State of Tennessee has commenced or is diligently prosecuting any court action or administrative proceeding to redress the violations described in the 60-day Notice and alleged in this Complaint.

9. The violations identified in the 60-day Notice that are the subject of this action are continuing at this time and are reasonably likely to continue in the future.

10. Venue is proper in this Court pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district. The Berry's Chapel Utility Sewage Treatment Plant is located at 180 Cottonwood Drive in Franklin in Williamson County, Tennessee. NPDES Permit No. TN0029718 (the "Permit") authorizes the discharge of wastewater from Outfall 001 into the Harpeth River at river mile 77.9. The facility and Outfall 001 at river mile 77.9 are where the violations identified in this complaint occurred.

11. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant's business is located within this judicial district, and pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims alleged in this complaint— that is, the Clean Water Act violations—occurred in and around the Harpeth River, within this judicial district.

**III. PARTIES**

12. Plaintiff Harpeth River Watershed Association is a "citizen" pursuant to the Clean Water Act, capable of bringing a citizen suit under the citizen suit provisions of the Clean Water Act, 33 U.S.C. § 1365.

13. The Watershed Association is a § 501(c)(3) non-profit public interest organization with its headquarters in Brentwood, Tennessee. The Watershed Association and its members are concerned about contamination of the Harpeth River and about threats to wildlife and wildlife

habitat posed by the pollutants in Defendant's discharge. They live, work, fish, swim, boat, view wildlife, engage in nature study and scientific study, and participate in other forms of recreation in and around the Harpeth River; Defendant's discharges impair these uses.

14.    Defendant Berry's Chapel Utility, Inc. (Tennessee Secretary of State Control No. 000635712) is a company doing business as Harpeth Wastewater Cooperative (since April 2014) in Williamson County, Tennessee and is a "person" subject to suit under the Clean Water Act. 33 U.S.C. § 1362(5). *See also* 33 U.S.C. § 1362(4).

15.    Defendant owns and operates the Berry's Chapel Utility Sewage Treatment Plant, the facility and sewer system that constitute the source of the violations described below.

16.    Defendant's Sewage Treatment Plant has a design capacity of 0.4 million gallons per day ("MGD").

## IV.    FACTUAL BACKGROUND

17.    The Harpeth River flows in a generally southeast-to-northwest direction for 125 miles through middle Tennessee and is partially designated as a State Scenic River. Tenn. Code Ann. §§ 11-13-101(b); 11-13-104. The Harpeth River is a seasonally variable stream and experiences extremely low flow conditions of less than one cubic feet per second during average summer months.

18.    The stretch of the Harpeth River that receives Defendant's discharge is identified by the code TN05130204009_3000. It is 16.8 miles long and begins downstream from downtown Franklin, Tennessee. This segment is currently classified for the following uses: Domestic Water Supply, Industrial Water Supply, Fish and Aquatic Life, Recreation, Livestock Watering and Wildlife, and Irrigation. Tenn. Comp. R. & Regs. 0400-40-04-.12 (2014). It

appears on Tennessee's list of waterways that do not meet water quality standards under the Clean Water Act. 33 U.S.C. § 1313; 40 C.F.R. § 130.10 ("the § 303(d) list").

19.     The Harpeth River is listed as impaired for its classified uses because of "low dissolved oxygen" and "total phosphorus," which are impairments caused by a "Municipal Point Source" and "Discharges from MS4 [Municipal Separate Storm Sewer System] area." *Final Version Year 2012 303(d) List*, Tenn. Dept. Env't & Conservation, at 37 (Jan. 2014).

20.     The Harpeth River has excessive levels of nutrients, which causes problems at the watershed level, but the need to control local nutrient input has regional and national implications because their aggregate impact can be devastating for commercial and recreational fisheries. *See* 79 Fed. Reg. 22,228 (Apr. 21, 2014).

21.     Under authority of the Tennessee Water Quality Control Act and the authority delegated to the State of Tennessee from the U.S. Environmental Protection Agency ("EPA"), the Tennessee Department of Environment and Conservation ("TDEC") has issued and renewed a National Pollutant Discharge Elimination System ("NPDES") permit to Defendant for its Sewage Treatment Plant. *See* 33 U.S.C. § 1342(b); Tenn. Code Ann. § 69-3-101 *et seq*.

22.     Defendant is allowed to operate its Sewage Treatment Plant only pursuant to NPDES permit number TN0029718, which authorizes the discharge wastewater from Outfall 001 into the Harpeth River at approximately river mile 77.9. *State of Tennessee NPDES Permit No. TN0029718*. (Issued October 22, 2010) (hereafter "*Berry's Chapel NPDES Permit (2010)*") (a true and exact copy of which is attached as **EXHIBIT 2**).

23.     The current version of Defendant's NPDES TN0029718 permit became effective on November 1, 2010, pursuant to the permitting requirements of the Clean Water Act, 33

U.S.C. § 1342, and expired on November 30, 2011. It has been administratively extended by TDEC pending the issuance of a renewed permit, for which Defendant has applied.

24.     More than a decade ago, to fulfil its obligation to administer and enforce the Clean Water Act as it relates to water quality, the State of Tennessee recommended numeric interpretations of the narrative water quality standard for nutrients for each of Tennessee's ecoregions (*i.e.*, areas with similar ecosystems and types, qualities, and quantities of environmental resources). Denton, Arnwine & Wang, *Development of Regionally-Based Interpretations of Tennessee's Narrative Nutrient Criteria*, Tenn. Dept. Env't & Conservation, at 49 (Aug. 2001) (hereafter "*Regionally-Based Interpretations*").

25.     Defendant's Sewage Treatment Plant is located in an area designated Level IV Ecoregion 71h. *Harpeth TMDL*, p. 6; Tenn. Comp. R. & Regs. 0400-40-03-.03(5) (defining ecoregion). According to *Regionally-Based Interpretations*, in Tennessee's Ecoregion 71h, the recommended numeric interpretation of the narrative criterion for Total Phosphorus is 0.18 milligrams per liter ("mg/l").

26.     Defendant's permit limit for Total Phosphorus, by contrast, provides that it can discharge up to a 5.7 mg/l (monthly average concentration) in the summer (May through October); there is no limit on how much phosphorus Defendant is permitted to discharge during the winter (November through April).

27.     When a waterbody is "impaired," the state or federal agency responsible for enforcing the Clean Water Act must develop a Total Maximum Daily Load ("TMDL") for each pollutant that prevents the waterbody from attaining water quality standards. The TMDL is a plan that helps identify sources of impairment and "quantifies the amount of a pollutant that can be assimilated in a waterbody." *See* 40 C.F.R. § 130.2(h) (2002). *See also* 40 C.F.R. § 130.2(i)

(2014). "Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C) (2014).

28.     In 2004, a TMDL was finalized for the Harpeth River, which set annual loads for nitrogen and dissolved oxygen. The TMDL did not establish a wasteload allocation for phosphorus.

## V.  CLAIMS FOR RELIEF: VIOLATIONS OF THE CLEAN WATER ACT, TENNESSEE WATER QUALITY CONTROL ACT, AND ALL IMPLEMENTING REGULATIONS

### ALLEGATIONS COMMON TO ALL CLAIMS

29.     Paragraphs 1-28 are hereby incorporated by reference as if rewritten in their entirety.

30.     As owner and operator of the Berry's Chapel Sewage Treatment Plant, Defendant is responsible for the violations of the Clean Water Act alleged herein.

31.     At all times relevant hereto, Defendant was and is responsible for complying with all applicable requirements of the Rules of the Tennessee Department of Environment and Conservation, the Tennessee Water Quality Control Act, and the Clean Water Act concerning the discharge of pollutants into the Harpeth River and its tributaries. 33 U.S.C. § 1317(a); *Berry's Chapel NPDES Permit*, § 3.8.1 (2010).

32.     Prior to filing this lawsuit, the Watershed Association notified Defendant that Defendant's pollutant discharges and permit non-compliance violate the Clean Water Act and interfere with the Watershed Association's rights.

33.     The purpose of providing defendants with notice of intent to sue is to provide an opportunity to come into compliance without the need for litigation.

34.     However, Defendant failed to correct all violations cited by the Watershed Association. As a result, Plaintiff and its members continue to suffer irreparable injury as a result of the discharges of Defendant's pollutants into the Harpeth River. The Watershed Association's remedies at law are inadequate to stop the continuing discharges by Defendant.

35.     The Harpeth River is a water of the United States or has a significant nexus to waters of the United States and thus are navigable waters as defined by the Clean Water Act and controlling authority. 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

36.     The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish that objective, Congress set the national goal that "the discharge of pollutants into the navigable waters be eliminated . . . ." *Id.*

37.     Section 301 of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from any point source to waters of the United States, except for discharges in compliance with a NPDES permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

38.     The Clean Water Act gives regulators the authority to require permittees to undertake tasks to further the Act's goal to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), "including but not limited to . . . developing or assisting in the development of any effluent limitation, or other limitation, prohibition, or effluent standard, pretreatment standard, or standard of performance under this chapter . . . ." 33 U.S.C. § 1318(a)(A).

39.     Because an NPDES permit provides a limited exception to the prohibition on discharging pollutants, a permit holder must strictly comply with the terms of its permit.

40.     The issuance of an NPDES permit "does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of federal, state, or local laws or regulations." *Berry's Chapel NPDES Permit* § 2.1.6 (2010).

41.     Each violation of an NPDES permit—and each "discharge of any pollutant" that is not authorized by a permit—constitute a separate violation of the Clean Water Act. *See, e.g.*, 33 U.S.C. § 1319(d) ("penalty . . . per day for each violation"); 33 U.S.C. §§ 1311(a), 1342(a), 1365(f). *See also* 40 C.F.R. § 122.41(a). *Accord* Tenn. Comp. R. & Regs. 1200-04-05-.07(2)(a)).

42.     The "discharge of any pollutant" means "any addition of any pollutant to navigable waters from any point source . . . ." 33 U.S.C. § 1362(12). The term "pollutant" includes sewage, garbage, sewage sludge, chemical wastes, biological materials, heat, and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). The term "point source" includes "any discernible, confined and discrete conveyance" from which pollutants may be discharged, including "any pipe, ditch, channel, tunnel, conduit, well [and] discrete fissure." *Id.* § 1362(14). The term "effluent limitation" means "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11).

43.     Nothing precludes a state from adopting or enforcing requirements which are more stringent or more extensive than those required under the Clean Water Act and its implementing regulations. 40 C.F.R. § 123.1(i)(1).

44.     Water quality-based effluent limitations are incorporated into NPDES permits if technology-based limitations alone are not sufficient to ensure compliance with applicable water quality standards. 33 U.S.C. §§ 1311(b)(1)(C), 1312(a), 1313(e)(3)(A); 40 C.F.R. § 122.44(d). Each permit must include requirements necessary to achieve water quality standards under the Clean Water Act, including state narrative criteria for water quality. 40 C.F.R. §§ 122.44(d)(1).

45.     The purpose of a water quality standard, as defined in the Clean Water Act, is to ensure that, wherever attainable, water quality provides for their use and value for public water supplies, propagation of fish and wildlife, and recreational purposes, among other uses. 33 U.S.C. § 1313(c)(2)(A); 33 U.S.C. § 1251(a)(2).

46.     Tennessee water quality standards provide that, "Waters have many uses which in the public interest are reasonable and necessary. Such uses include: sources of water supply for domestic and industrial purposes; propagation and maintenance of fish and other aquatic life; recreation in and on the waters including the safe consumption of fish and shellfish; livestock watering and irrigation; navigation; generation of power; propagation and maintenance of wildlife; and the enjoyment of scenic and aesthetic qualities of waters." Tenn. Comp. R. & Regs. 0400-40-03.02(2) (2014).

47.     Defendant's NPDES permit provides that, "The wastewater discharge shall not contain pollutants in quantities that will be hazardous or otherwise detrimental to humans, livestock, wildlife, plant life, or fish and aquatic life in the receiving stream." *Berry's Chapel NPDES Permit* § 1.1 (2010). It also informs that, "notwithstanding this Permit, it shall be the

responsibility of the permittee to conduct its wastewater treatment and/or discharge activities in a manner such that public or private nuisances of health hazards will not be created." *Berry's Chapel NPDES Permit* § 2.4.1 (2010).

48.     Further, Defendant's NPDES permit incorporates Tennessee's "Antidegradation Statement" into Defendant's obligations for permit compliance. *Berry's Chapel NPDES Permit* § 3.7 (2010). *See* 40 C.F.R. § 131.12 (2014). *See* Tenn. Comp. R. & Regs. 0400-40-03-.06 (2014).

49.     Defendant's permit informs: "Any permit noncompliance constitutes a violation of applicable state and federal laws and is grounds for enforcement action, permit termination, permit modification, or denial of permit reissuance." *Berry's Chapel NPDES Permit* § 2.3.1 (2010).

50.     The NPDES permitting program relies primarily on self-reporting by permittees to determine compliance. As such, Defendant is required to record and submit Discharge Monitoring Reports ("DMRs") and Monthly Operating Reports ("MORs") to show it is in compliance with the permit. *Berry's Chapel NPDES Permit* §§ 1.3.1, 1.3.4 (2010).

51.     Reports must be signed and certified. *Berry's Chapel NPDES Permit* § 1.3.1 (2010). *See also* 40 C.F.R. § 122.22(d) (requiring certification by authorized agent of permittee that information submitted with DMR is "true, accurate, and complete"); Tenn. Comp. R. & Regs. 1200-04-10-.03(e)(4) (2013); Tenn. Comp. R. & Regs. 0400-40-05-.07(f) (2014).

52.     Defendant must report any permit non-compliance on its DMRs. *Berry's Chapel NPDES Permit* § 2.3.2 (2010).

53.     Based on Defendant's own public reports to TDEC, Defendant has a long-standing and continuing history of unauthorized discharges from the Sewage Treatment Plant

and its sewer system into the Harpeth River and other waters of the United States, such as discharges of excess pollutants, wet and dry weather overflows, and bypasses.

54.     Based on Defendant's own public reports to TDEC, Defendant has a long-standing and continuing history of non-compliance with its NPDES permit, including failure to develop or implement a nutrient management plan, failure to operate its plant in accordance with its permit, and failure to accurately measure its influent.

55.     Each of the Defendant's unauthorized discharges of pollutants is a violation of the terms of its discharge permit, and thus a violation of the Clean Water Act.

56.     Each of the Defendant's failures to comply with the terms of its discharge permit is a violation of the Clean Water Act.

57.     The Clean Water Act allows enforcement of a state's permit water quality provisions. *See* 33 U.S.C. §§ 1365(a)(1), 1365(f), 1342(b).

58.     Section 505 of the Clean Water Act authorizes any citizen to commence a civil action "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation . . . ." 33 U.S.C. § 1365(a)(1).

59.     Such enforcement action under Clean Water Act § 505, 33 U.S.C. § 1365, includes an action seeking remedies for violation of "a permit or condition thereof issued under section 1342 of this title," that is, under section 402 of the Clean Water Act. 33 U.S.C. § 1365(f).

60.     Section 505(a) of the Clean Water Act authorizes an action for injunctive relief. 33 U.S.C. § 1365(a).

61.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505(a) of the Clean Water Act. 33 U.S.C. § 1319(d)

(Availability of Civil Monetary Penalties); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

62.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorney fees and expert witness fees.

63.     Based on Defendant's past history of noncompliance with its NPDES Permit, and continuing violation thereof from the time of the 60-day notice to the present, it is reasonably likely that Defendant's illegal discharges will continue to occur in the absence of a remedy provided by this Court.

64.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters, as well as Harpeth River Watershed Association and its members, for which harm they have no adequate remedy at law

65.     These types of continued violations may have a significant impact on water quality, aquatic life, and human health.

## COUNT 1: NUMERIC VIOLATIONS AND OVERFLOWS

66.     Paragraphs 1-65 are hereby incorporated by reference as if rewritten in their entirety.

67.     Section 1.1's of Defendant's permit contains effluent limitations which limits the discharge of certain enumerated pollutants into the Harpeth River.

68.     In addition, "[A]ny release of sewage from any portion of the collection, transmission, or treatment system other than through permitted outfalls" is called an "overflow." Overflows are prohibited. *Berry's Chapel NPDES Permit*, § 2.3.3(a), (b) (2010).

69.     Defendant's permit requires it to submit monthly reports to TDEC with a "summary report of known or suspected instances of overflows in the collection system or bypass of wastewater treatment facilities." *Berry's Chapel NPDES Permit* § 1.3.5.1 (2010).

70.     "The [overflow] report must contain the date and duration of the instances of overflow and/or bypassing and the estimated quantity of wastewater released and/or bypassed." *Berry's Chapel NPDES Permit* § 1.3.5.1 (2010).

71.     Defendant's own records submitted under oath to TDEC show that Defendant violated its NPDES permit's prohibition on overflows and reporting requirements for overflows, as reflected in the following chart:

| Date of Violation(s) | Permit Parameter Violated | Permit Limit | Reported on DMR (or MOR) | Additional Detail from DMR, MOR or Noncompliance Report |
|---|---|---|---|---|
| July 3, 2009 | Daily Chlorine mg/L max. | 0.03 | (0.10) | DMR indicates "0.05" for the maximum result and "0" exceedances/excursions |
| July 13, 2009 | Daily Chlorine mg/L max. | 0.03 | (0.20) | DMR indicates "0.05" for the maximum result and "0" exceedances/excursions |
| July 15, 2009 | Daily Chlorine mg/L max. | 0.03 | (0.09) | DMR indicates "0.05" for the maximum result and "0" exceedances/excursions " |
| August 3, 2009 | Daily Total Suspended Solids mg/L max. | 45 | 54 | |
| March 1 - March 31, 2010 | Monthly Total Suspended Solids % removal avg. | 85% | 82.2% | |

| Date of Violation(s) | Permit Parameter Violated | Permit Limit | Reported on DMR (or MOR) | Additional Detail from DMR, MOR or Noncompliance Report |
|---|---|---|---|---|
| May 1 - May 4, 2010 | Wet Weather Overflow | 0 | 1 | DMR indicates "1" wet weather overflow exceedances/excursions; noncompliance report states lost control on May 1, regained full operations on May 4. Also self-reported "flood" on May 5. |
| December 31, 2010 | Daily Chlorine mg/L max. | 0.03 | (0.10) | DMR indicates 0.01 with no exceedances/excursions |
| April 5, 2011 | Daily Chlorine mg/L max. | 0.03 | 0.20 | |
| April 6, 2011 | Daily Chlorine mg/L max. | 0.03 | (0.07) | |
| March 3 - March 5, 2013 | Dry Weather Overflow | 0 | 3 | |
| August 8, 2013 | Daily Dissolved Oxygen mg/L min. | 6.0 | 5.9 | |
| August 8, 2013 | Daily Dissolved Oxygen mg/L min. | 6.0 | 5.9 | |
| August 9, 2013 | Daily Carbonaceous Biochemical Oxygen Demand mg/L max. | 10.0 | 12.2 | DMR indicates "0" exceedances/excursions |

72.    Each day of the period (daily, weekly, or monthly) of violations constitutes a separate violation of the permit and of the Clean Water Act.

73.    Defendant's efforts have been inadequate to prevent recurrent illegal discharges. These discharges are therefore likely to continue. Plaintiff and its members have suffered damage and continue to suffer damage as a result of Defendant's actions and/or omissions described in this count. These actual and potential injuries have been, are being, and will continue to be caused by the illegal discharges from the Berry's Chapel Utility Sewage

Treatment Plant and sewage collection system into waters of the United States. The relief sought herein will redress the harms to the Harpeth River Watershed Association and its members caused by Defendant's discharges. Their injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial action to stop the illegal discharges of pollutants into the Harpeth River and to comply with such other relief as this Court deems necessary.

## COUNT 2: MONITORING VIOLATIONS

74.    Paragraphs 1-73 are hereby incorporated by reference as if rewritten in their entirety.

75.    Defendant's own records submitted under oath to TDEC show that Defendant violated its NPDES permit's requirement that all discharges "shall be . . . monitored . . . as specified" in § 1.1, as reflected in the following chart. The first two columns of the chart show the date of the violations and the number of days Berry's Chapel was in violation. The next columns show the *"Parameter Violated"* (*i.e.*, the monitoring provision violated during the relevant monitoring period); the "*Monitoring Required by the Permit*" (*i.e.*, the minimum number of measurements per monitoring period); and the "*Monitoring Actually Reported*" (*i.e.*, the actual number of measurements performed by the permittee during the monitoring period, as listed in the permittee's MOR and used in the permittee's DMR to satisfy the permit's reporting requirements).

| Date of Violations | Monitoring Parameter Violated | Monitoring Required by Permit | Monitoring Actually Reported |
|---|---|---|---|
| January 25 - January 31, 2009 | Effluent Dissolved Oxygen monitoring | 5/week | 4/week |
| January 25 - January 31, 2009 | Effluent pH monitoring | 5/week | 4/week |

| Date of Violations | Monitoring Parameter Violated | Monitoring Required by Permit | Monitoring Actually Reported |
|---|---|---|---|
| January 25 - January 31, 2009 | Effluent Chlorine monitoring | 5/week | 4/week |
| February 1 - February 7, 2009 | Effluent pH monitoring | 5/week | 3/week |
| February 22 - February 28, 2009 | Effluent *E. coli* monitoring | 3/week | 0/week |
| March 29 - April 4, 2009 | Effluent *E. coli* monitoring | 3/week | 2/week |
| April 19 - April 25, 2009 | Effluent Dissolved Oxygen monitoring | 5/week | 4/week |
| April 19 - April 25, 2009 | Effluent pH monitoring | 5/week | 4/week |
| April 19 - April 25, 2009 | Effluent Chlorine monitoring | 5/week | 4/week |
| April 26 - May 2, 2009 | Effluent Dissolved Oxygen monitoring | 5/week | 4/week |
| April 26 - May 2, 2009 | Effluent pH monitoring | 5/week | 4/week |
| April 26 - May 2, 2009 | Effluent Chlorine monitoring | 5/week | 4/week |
| June 21 - June 27, 2009 | Effluent Chlorine monitoring | 5/week | 3/week |
| June 28 - July 4, 2009 | Influent Carbonaceous Biochemical Oxygen Demand monitoring | 3/week | 2/week |
| June 28 - July 4, 2009 | Effluent Carbonaceous Biochemical Oxygen Demand monitoring | 3/week | 2/week |
| June 28 - July 4, 2009 | Influent Total Suspended Solids monitoring | 3/week | 2/week |
| June 28 - July 4, 2009 | Effluent Total Suspended Solids monitoring | 3/week | 2/week |
| June 28 - July 4, 2009 | Effluent Ammonia as Nitrogen monitoring | 3/week | 2/week |
| June 28 - July 4, 2009 | Effluent *E. coli* monitoring | 3/week | 2/week |
| July 5 - July 11, 2009 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| July 12 - July 18, 2009 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| October 11 - October 17, 2009 | Effluent Dissolved Oxygen monitoring | 5/week | 4/week |
| October 11 - October 17, 2009 | Effluent pH monitoring | 5/week | 4/week |
| November 22 - November 28, 2009 | Effluent Dissolved Oxygen monitoring | 5/week | 4/week |
| November 22 - November 28, 2009 | Effluent pH monitoring | 5/week | 4/week |

| Date of Violations | Monitoring Parameter Violated | Monitoring Required by Permit | Monitoring Actually Reported |
|---|---|---|---|
| November 22 - November 28, 2009 | Effluent Chlorine monitoring | 5/week | 4/week |
| November 29 - December 5, 2009 | Effluent pH monitoring | 5/week | 4/week |
| November 29 - December 5 2009 | Effluent Chlorine monitoring | 5/week | 4/week |
| November 29 - December 5, 2009 | Effluent *E. coli* monitoring | 3/week | 2/week |
| December 6 - December 12, 2009 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| December 20 - December 26, 2009 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| December 20 - December 26, 2009 | Effluent pH monitoring | 5/week | 3/week |
| December 20 - December 26, 2009 | Effluent Chlorine monitoring | 5/week | 3/week |
| December 27 - January 2 2010 | Effluent Dissolved Oxygen monitoring | 5/week | 4/week |
| December 27 - January 2, 2010 | Effluent pH monitoring | 5/week | 3/week |
| December 27 - January 2, 2010 | Effluent Chlorine monitoring | 5/week | 3/week |
| February 28 - March 6, 2010 | Effluent Ammonia as Nitrogen monitoring | 3/week | 2/week |
| March 28 - April 3, 2010 | Effluent *E. coli* monitoring | 3/week | 2/week |
| April 25 - May 1, 2010 | Influent Flow monitoring | 7/week | 6/week |
| April 25 - May 1, 2010 | Effluent Flow monitoring | 7/week | 6/week |
| April 25 - May 1, 2010 | Influent Carbonaceous Biochemical Oxygen Demand monitoring | 3/week | 1/week |
| April 25 - May 1, 2010 | Effluent Carbonaceous Biochemical Oxygen Demand monitoring | 3/week | 1/week |
| May 2 - May 8, 2010 | Influent Flow monitoring | 7/week | 3/week |
| May 2 - May 8, 2010 | Effluent Flow monitoring | 7/week | 3/week |
| May 2 - May 8, 2010 | Influent Carbonaceous Biochemical Oxygen Demand monitoring | 3/week | 1/week |
| May 2 - May 8, 2010 | Effluent Carbonaceous Biochemical Oxygen Demand monitoring | 3/week | 1/week |

| Date of Violations | Monitoring Parameter Violated | Monitoring Required by Permit | Monitoring Actually Reported |
|---|---|---|---|
| May 2 - May 8, 2010 | Effluent Ammonia as Nitrogen monitoring | 3/week | 0/week |
| May 2 - May 8, 2010 | Influent Total Suspended Solids monitoring | 3/week | 0/week |
| May 2 - May 8, 2010 | Effluent Total Suspended Solids monitoring | 3/week | 0/week |
| May 2 - May 8, 2010 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| May 2 - May 8, 2010 | Effluent pH monitoring | 5/week | 2/week |
| May 2 - May 8, 2010 | Effluent Chlorine monitoring | 5/week | 2/week |
| May 2 - May 8, 2010 | Effluent *E. coli* monitoring | 3/week | 0/week |
| May 9 - May 15, 2010 | Effluent Ammonia as Nitrogen monitoring | 3/week | 0/week |
| May 23 - May 29, 2010 | Influent Total Suspended Solids monitoring | 3/week | 2/week |
| May 23 - May 29, 2010 | Effluent Total Suspended Solids monitoring | 3/week | 2/week |
| June 13 - June 19, 2010 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| June 20 - June 26, 2010 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| August 29 - September 4, 2010 | Effluent Ammonia as Nitrogen monitoring | 3/week | 2/week |
| August 29 - September 4, 2010 | Effluent Dissolved Oxygen monitoring | 5/week | 4/week |
| August 29 - September 4, 2010 | Effluent pH monitoring | 5/week | 4/week |
| August 29 - September 4, 2010 | Effluent Chlorine monitoring | 5/week | 4/week |
| October 3 - October 9, 2010 | Effluent Ammonia as Nitrogen monitoring | 3/week | 1/week |
| November 28 - December 4, 2010 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| December 12 - December 18, 2010 | Influent Flow monitoring | 7/week | 2/week |
| December 19 - December 25, 2010 | Influent Flow monitoring | 7/week | 0/week |
| December 26 - January 1, 2011 | Influent Flow monitoring | 7/week | 0/week |
| January 2 - January 8, 2011 | Influent Flow monitoring | 7/week | 5/week |
| March 6 - March 12, 2011 | Effluent Ammonia as Nitrogen monitoring | 3/week | 2/week |

| Date of Violations | Monitoring Parameter Violated | Monitoring Required by Permit | Monitoring Actually Reported |
|---|---|---|---|
| January 1 - March 31, 2011 | Quarterly Influent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2011 | Quarterly Effluent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2011 | Quarterly Influent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2011 | Quarterly Effluent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2011 | Quarterly Total Nitrogen % removal monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2011 | Quarterly Total Phosphorus % removal monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2011 | Quarterly Effluent Total Nitrogen lb/day monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2011 | Quarterly Effluent Total Phosphorus lb/day monitoring | 1/quarter | 0/quarter |
| March 27 - April 2, 2011 | Effluent Dissolved Oxygen monitoring | 5/week | 4/week |
| March 27 - April 2, 2011 | Effluent pH monitoring | 5/week | 4/week |
| March 27 - April 2, 2011 | Effluent Chlorine monitoring | 5/week | 3/week |
| April 3 - April 9, 2011 | Effluent pH monitoring | 5/week | 3/week |
| April 3 - April 9, 2011 | Effluent Chlorine monitoring | 5/week | 2/week |
| May 22 - May 28, 2011 | Effluent *E. coli* monitoring | 3/week | 2/week |
| May 1 - May 31, 2011 | Total Nitrogen monitoring | 2/month | 1/month[1] |
| May 1 - May 31, 2011 | Total Phosphorus monitoring | 2/month | 1/month[2] |
| May 1 - May 31, 2011 | Insoluble TKN monitoring | 2/month | 1/month |
| May 1 - May 31, 2011 | Insoluble Phosphorus monitoring | 2/month | 1/month |
| May 29 - June 4, 2011 | Effluent Ammonia as Nitrogen monitoring | 3/week | 2/week |
| May 29 - June 4, 2011 | Effluent Chlorine monitoring | 5/week | 4/week |
| April 1 - June 30, 2011 | Quarterly Influent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2011 | Quarterly Effluent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2011 | Quarterly Influent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |

---

[1] Note that the second measurement taken during May 2011 showed "0.00" as the test result for both Total Nitrogen and Total Phosphorus.
[2] *Id.*

| Date of Violations | Monitoring Parameter Violated | Monitoring Required by Permit | Monitoring Actually Reported |
|---|---|---|---|
| April 1 - June 30, 2011 | Quarterly Effluent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2011 | Quarterly Total Nitrogen % removal monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2011 | Quarterly Total Phosphorus % removal monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2011 | Quarterly Effluent Total Nitrogen lb/day monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2011 | Quarterly Effluent Total Phosphorus lb/day monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2011 | Quarterly Influent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2011 | Quarterly Effluent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2011 | Quarterly Influent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2011 | Quarterly Effluent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2011 | Quarterly Total Nitrogen % removal monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2011 | Quarterly Total Phosphorus % removal monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2011 | Quarterly Effluent Total Nitrogen lb/day monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2011 | Quarterly Effluent Total Phosphorus lb/day monitoring | 1/quarter | 0/quarter |
| October 30 - November 5, 2011 | Effluent Dissolved Oxygen monitoring | 5/week | 4/week |
| October 30 - November 5, 2011 | Effluent pH monitoring | 5/week | 4/week |
| October 30 - November 5, 2011 | Influent Total Suspended Solids monitoring | 3/week | 2/week |
| October 30 - November 5, 2011 | Effluent Total Suspended Solids monitoring | 3/week | 2/week |
| October 30 - November 5, 2011 | Effluent Chlorine monitoring | 5/week | 4/week |
| October 30 - November 5, 2011 | Effluent *E. coli* monitoring | 3/week | 0/week |
| November 20 - November 26, 2011 | Effluent Dissolved Oxygen monitoring | 5/week | 4/week |
| November 20 - November 26, 2011 | Effluent pH monitoring | 5/week | 4/week |

| Date of Violations | Monitoring Parameter Violated | Monitoring Required by Permit | Monitoring Actually Reported |
|---|---|---|---|
| November 20 - November 26, 2011 | Effluent Chlorine monitoring | 5/week | 4/week |
| October 1 - December 31, 2011 | Quarterly Influent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2011 | Quarterly Effluent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2011 | Quarterly Influent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2011 | Quarterly Effluent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2011 | Quarterly Total Nitrogen % removal monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2011 | Quarterly Total Phosphorus % removal monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2011 | Quarterly Effluent Total Nitrogen lb/day monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2011 | Quarterly Effluent Total Phosphorus lb/day monitoring | 1/quarter | 0/quarter |
| January 29 - February 4, 2012 | Effluent Ammonia as Nitrogen monitoring | 3/week | 2/week |
| January 29 - February 4, 2012 | Effluent Settleable Solids monitoring | 3/week | 2/week |
| January 29 - February 4, 2012 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| January 29 - February 4, 2012 | Effluent pH monitoring | 5/week | 3/week |
| January 29 - February 4, 2012 | Influent Total Suspended Solids monitoring | 3/week | 2/week |
| January 29 - February 4, 2012 | Effluent Total Suspended Solids monitoring | 3/week | 2/week |
| January 29 - February 4, 2012 | Effluent Chlorine monitoring | 5/week | 3/week |
| January 29 - February 4, 2012 | Effluent *E. coli* monitoring | 3/week | 2/week |
| February 26 - March 3, 2012 | Effluent Ammonia as Nitrogen monitoring | 3/week | 0/week |
| March 4 - March 10, 2012 | Effluent Ammonia as Nitrogen monitoring | 3/week | 2/week |
| January 1 - March 31, 2012 | Quarterly Influent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2012 | Quarterly Effluent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |

| Date of Violations | Monitoring Parameter Violated | Monitoring Required by Permit | Monitoring Actually Reported |
|---|---|---|---|
| January 1 - March 31, 2012 | Quarterly Influent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2012 | Quarterly Effluent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2012 | Quarterly Total Nitrogen % kl., | 1/quarter | 0/quarter |
| January 1 - March 31, 2012 | Quarterly Total Phosphorus % removal monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2012 | Quarterly Effluent Total Nitrogen lb/day monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2012 | Quarterly Effluent Total Phosphorus lb/day monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2012 | Quarterly Influent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2012 | Quarterly Effluent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2012 | Quarterly Influent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2012 | Quarterly Effluent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2012 | Quarterly Total Nitrogen % removal monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2012 | Quarterly Total Phosphorus % removal monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2012 | Quarterly Effluent Total Nitrogen lb/day monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2012 | Quarterly Effluent Total Phosphorus lb/day monitoring | 1/quarter | 0/quarter |
| August 1 - August 31, 2012 | Total Phosphorus monitoring | 2/month | 1/month[3] |
| July 1 - September 30, 2012 | Quarterly Influent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2012 | Quarterly Effluent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2012 | Quarterly Influent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2012 | Quarterly Effluent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2012 | Quarterly Total Nitrogen % removal monitoring | 1/quarter | 0/quarter |

[3] Note that the second measurement taken during August 2012 showed "0.00" as the test result for both Total Nitrogen and Total Phosphorus.

| Date of Violations | Monitoring Parameter Violated | Monitoring Required by Permit | Monitoring Actually Reported |
|---|---|---|---|
| July 1 - September 30, 2012 | Quarterly Total Phosphorus % removal monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2012 | Quarterly Effluent Total Nitrogen lb/day monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2012 | Quarterly Effluent Total Phosphorus lb/day monitoring | 1/quarter | 0/quarter |
| October 14 - October 20, 2012 | Effluent Chlorine monitoring | 5/week | 4/week |
| November 18 - November 24, 2012 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| November 18 - November 24, 2012 | Effluent pH monitoring | 5/week | 3/week |
| November 18 - November 24, 2012 | Influent Total Suspended Solids monitoring | 3/week | 2/week |
| November 18 - November 24, 2012 | Effluent Total Suspended Solids monitoring | 3/week | 2/week |
| November 18 - November 24, 2012 | Effluent Chlorine monitoring | 5/week | 3/week |
| December 23 - December 29, 2012 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| December 23 - December 29, 2012 | Effluent pH monitoring | 5/week | 4/week |
| December 23 - December 29, 2012 | Effluent Chlorine monitoring | 5/week | 3/week |
| October 1 - December 31, 2012 | Quarterly Influent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2012 | Quarterly Effluent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2012 | Quarterly Influent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2012 | Quarterly Effluent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2012 | Quarterly Total Nitrogen % removal monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2012 | Quarterly Total Phosphorus % removal monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2012 | Quarterly Effluent Total Nitrogen lb/day monitoring | 1/quarter | 0/quarter |
| October 1 - December 31, 2012 | Quarterly Effluent Total Phosphorus lb/day monitoring | 1/quarter | 0/quarter |
| December 30 - January 5, 2013 | Effluent Settleable Solids monitoring | 3/week | 2/week |

| Date of Violations | Monitoring Parameter Violated | Monitoring Required by Permit | Monitoring Actually Reported |
|---|---|---|---|
| December 30 - January 5, 2013 | Effluent Dissolved Oxygen monitoring | 5/week | 3/week |
| December 30 - January 5, 2013 | Effluent pH monitoring | 5/week | 3/week |
| December 30 - January 5, 2013 | Effluent Chlorine monitoring | 5/week | 3/week |
| January 1 - March 31, 2013 | Quarterly Influent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2013 | Quarterly Effluent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2013 | Quarterly Influent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2013 | Quarterly Effluent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2013 | Quarterly Total Nitrogen % removal monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2013 | Quarterly Total Phosphorus % removal monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2013 | Quarterly Effluent Total Nitrogen lb/day monitoring | 1/quarter | 0/quarter |
| January 1 - March 31, 2013 | Quarterly Effluent Total Phosphorus lb/day monitoring | 1/quarter | 0/quarter |
| June 2 - June 8, 2013 | Effluent Chlorine monitoring | 5/week | 4/week |
| April 1 - June 30, 2013 | Quarterly Influent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2013 | Quarterly Effluent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2013 | Quarterly Influent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2013 | Quarterly Effluent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2013 | Quarterly Total Nitrogen % removal monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2013 | Quarterly Total Phosphorus % removal monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2013 | Quarterly Effluent Total Nitrogen lb/day monitoring | 1/quarter | 0/quarter |
| April 1 - June 30, 2013 | Quarterly Effluent Total Phosphorus lb/day monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2013 | Quarterly Influent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2013 | Quarterly Effluent Total Nitrogen mg/L monitoring | 1/quarter | 0/quarter |

| Date of Violations | Monitoring Parameter Violated | Monitoring Required by Permit | Monitoring Actually Reported |
|---|---|---|---|
| July 1 - September 30, 2013 | Quarterly Influent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2013 | Quarterly Effluent Total Phosphorus mg/L monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2013 | Quarterly Total Nitrogen % removal monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2013 | Quarterly Total Phosphorus % removal monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2013 | Quarterly Effluent Total Nitrogen lb/day monitoring | 1/quarter | 0/quarter |
| July 1 - September 30, 2013 | Quarterly Effluent Total Phosphorus lb/day monitoring | 1/quarter | 0/quarter |

76.     Each day of the period (daily, weekly, or monthly) of violations constitutes a separate violation of the permit and of the Clean Water Act.

77.     The recurrent nature of these violations indicates that these violations are likely to continue. Plaintiff and its members have suffered damage and continue to suffer damage as a result of Defendant's actions and/or omissions described in this count. These actual and potential injuries have been, are being, and will continue to be caused by Defendant's failure to monitor and accurately report its discharge. The relief sought herein will redress the harms to the Harpeth River Watershed Association and its members caused by Defendant's discharges. Their injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial action to require accurate monitoring of discharges of pollutants into the Harpeth River and to comply with such other relief as this Court deems necessary.

### COUNT 3: REPORTING AND DUTY TO REPORT NON-COMLIANCE VIOLATIONS

78.     Paragraphs 1-77 are hereby incorporated by reference as if rewritten in their entirety.

79.    Defendant's own records submitted under oath to TDEC show that Defendant violated its NPDES permit's requirement to accurately report its operations and report any non-compliance. The column of the following chart labeled "***Month of Reporting Violation***" indicates the monthly reporting period during which the violation occurred; the "***Number of Violations***" column identifies how many violations stem from the reporting failure; the "***Permit Requirement Violated***" column identifies whether the violation involves the duty to report noncompliance or the failure to properly report the monitoring of a particular effluent parameter; and the "***Explanation of Reporting Violation***" column provides additional information on the alleged violation from the MORs and DMRs submitted by Berry's Chapel. Failure to report is accounted for from December 2010 to the October 2013, due to the three year record retention requirement of Permit § 1.2.5.

| Month of Reporting Violation | Permit Requirement Violated | Explanation of Reporting Violation |
|---|---|---|
| January 2009 | Ammonia as Nitrogen Effluent reporting | Ammonia as Nitrogen weekly lb/day average DMR entry lists 0.10; MOR indicates an entry of 0.70 |
| April 2009 | TSS Effluent reporting | Total Suspended Solids weekly lb/day average DMR entry lists 22.0; MOR indicates an entry of 20.2 |
| July 2009 | Effluent Chlorine reporting | Chlorine daily mg/L of 0.10, 0.20, & 0.09 violate permit limit, excursions not indicated on DMR |
| December 2010 | Duty to Report Noncompliance | Dissolved Oxygen monitoring (1 week); chlorine daily mg/L maximum |
| December 2010 | Effluent Chlorine reporting | Chlorine daily mg/L of 0.10 violates permit limit, value of 0.01 listed on DMR and excursion not noted |
| January 2011 | Effluent Dissolved Oxygen reporting | Dissolved Oxygen daily mg/L DMR entry lists 10.3; MOR indicates an entry of 9.1 |
| March 2011 | Duty to Report Noncompliance | Ammonia as Nitrogen monitoring (1 week: March 6-12); quarterly nutrient monitoring (8 violations) |
| April 2011 | Duty to Report Noncompliance | Dissolved Oxygen monitoring (1 week); pH monitoring (2 weeks); chlorine monitoring (2 weeks); chlorine daily mg/L maximum (2 |

| Month of Reporting Violation | Permit Requirement Violated | Explanation of Reporting Violation |
|---|---|---|
| | | violations) |
| May 2011 | Duty to Report Noncompliance | *E. coli* monitoring (1 week) |
| June 2011 | Duty to Report Noncompliance | Ammonia as Nitrogen monitoring (1 week); chlorine monitoring (1 week); quarterly nutrient monitoring (8 violations) |
| September 2011 | Duty to Report Noncompliance | Quarterly nutrient monitoring (8 violations) |
| November 2011 | Duty to Report Noncompliance | Dissolved Oxygen monitoring (2 weeks); pH monitoring (2 weeks); Influent & Effluent Total Suspended Solids monitoring (1 week each); chlorine monitoring (2 weeks); *E. coli* monitoring (1 week) |
| December 2011 | Duty to Report Noncompliance | Quarterly nutrient monitoring (8 violations) |
| February 2012 | Duty to Report Noncompliance | Ammonia as Nitrogen monitoring (1 week); settleable solids monitoring (1 week); Dissolved Oxygen monitoring (1 week); pH monitoring (1 week); Influent & Effluent Total Suspended Solids monitoring (1 week each); Chlorine monitoring (1 week); *E. coli* monitoring (1 week) |
| March 2012 | Duty to Report Noncompliance | Ammonia as Nitrogen monitoring (2 weeks); quarterly nutrient monitoring (8 violations) |
| April 2012 | MOR not submitted | Neither TDEC field office nor headquarters has copy of MOR |
| June 2012 | Duty to Report Noncompliance | Quarterly nutrient monitoring (8 violations) |
| August 2012 | Total Phosphorus reporting | One measurement of Total Phosphorus stated as "0.0" on MOR, while corresponding Insoluble Phosphorus value is "3.57"; Phosphorus DMR entries rely on these measurements |
| September 2012 | Duty to Report Noncompliance | Quarterly nutrient monitoring (8 violations) |
| October 2012 | Duty to Report Noncompliance | Chlorine monitoring (1 week) |
| November 2012 | Duty to Report Noncompliance | Dissolved Oxygen monitoring (1 week); pH monitoring (1 week); Influent & Effluent Total Suspended Solids monitoring (1 week each); Chlorine monitoring (1 week) |
| December 2012 | Duty to Report Noncompliance | Dissolved Oxygen monitoring (1 week); pH monitoring (1 week); Chlorine monitoring (1 |

| Month of Reporting Violation | Permit Requirement Violated | Explanation of Reporting Violation |
|---|---|---|
| | | week); Quarterly nutrient monitoring (8 violations) |
| January 2013 | Duty to Report Noncompliance | Settleable solids monitoring (1 week); Dissolved Oxygen monitoring (1 week); pH monitoring (1 week); Chlorine monitoring (1 week) |
| February 2013 | TSS Effluent reporting | Total Suspended Solids monthly lb/day average DMR entry lists 0.0; MOR indicates the entry should be 0.47 |
| March 2013 | Duty to Report Noncompliance | Quarterly nutrient monitoring (8 violations) |
| May 2013 | TSS Effluent reporting | Total Suspended Solids monthly lb/day average DMR entry lists 0.0; MOR indicates an entry of 0.1 |
| June 2013 | Duty to Report Noncompliance | Chlorine monitoring (1 week); Quarterly nutrient monitoring (8 violations) |
| August 2013 | Duty to Report Noncompliance | Carbonaceous Biochemical Oxygen Demand daily mg/L maximum |
| August 2013 | CBOD Effluent reporting | Carbonaceous Biochemical Oxygen Demand daily mg/L of 12.2 violates permit limit, excursion not indicated on DMR |
| September 2013 | Duty to Report Noncompliance | Quarterly nutrient monitoring (8 violations) |
| October 2013 | TSS Effluent reporting | TSS weekly lb/day & mg/L average DMR entries list values for week ending in the subsequent month |
| October 2013 | Ammonia as Nitrogen Effluent reporting | Ammonia as Nitrogen weekly lb/day & mg/L average DMR entries list values for week ending in the subsequent month |

80.     Each failure constitutes a separate violation of the permit and of the Clean Water Act.

81.     The recurrent nature of these violations indicates that they are likely to continue. Plaintiff and its members have suffered damage and continue to suffer damage as a result of Defendant's actions and/or omissions described in this count. These actual and potential injuries have been, are being, and will continue to be caused by the illegal discharges from the Berry's Chapel Utility Sewage Treatment Plant and sewage collection system into waters of the United

States. The relief sought herein will redress the harms to the Harpeth River Watershed Association and its members caused by Defendant's discharges. Their injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial action to stop the illegal discharges of pollutants into the Harpeth River and to comply with such other relief as this Court deems necessary.

### COUNT 4: INACCURATE MEASUREMENT AND UNRELIABLE DATA

82.     Paragraphs 1-81 are hereby incorporated by reference as if rewritten in their entirety.

83.     Defendant has violated and continues to violate Permit § 1.1 and § 1.2.1, which states, "Appropriate flow measurement devices and methods consistent with accepted scientific practices shall be selected and used to insure the accuracy and reliability of measurements of the volume of monitored discharges. The devices shall be installed, calibrated and maintained to insure that the accuracy of the measurements is consistent with accepted capability of that type of device. Devices selected shall be capable of measuring flows with a maximum deviation of less than plus or minus 10% from the true discharge rates throughout the range of expected discharge volumes." *Accord Berry's Chapel NPDES Permit* § 1.3.6 (2010) ("The permittee must use the correct detection levels in all analytical testing required in the permit.").

84.     Defendant has violated and continues to violate Permit § 2.1.4, which instructs that, "The permittee shall at all times properly operate and maintain all facilities and systems (and related appurtenances) for collection and treatment which are installed or used by the permittee to achieve compliance with the terms and conditions of this permit. Proper operation and maintenance also includes adequate laboratory and process controls and appropriate quality

assurance procedures." *Berry's Chapel NPDES Permit* § 2.1.4(a) (2010). *Accord* Tenn. R. & Regs. 400-40-05-.07(2)(c) (2014).

85.     Defendant's permit requires it to accurately monitor its influent raw wastewater and treated effluent flows, and it must do so continuously seven days per week. *Berry's Chapel NPDES Permit* § 1.1 (2010). *See also Berry's Chapel Rationale* § R7.1 (Flow).

86.     This is important because flow is monitored and used to calculate contaminant mass loading rates." *Berry's Chapel Rationale* § R7.1 (Flow).

87.     In other words, due to Defendant's inaccurate flow measuring capacity, it not presently possible to determine with accuracy the amounts of pollutants discharged.

88.     Since at least 2011, Defendant's influent sampling data have been and continue to be inaccurate.

89.     In January 2012, TDEC informed Berry's Chapel that it was in violation of its NPDES permit based on the following observations made during a September 2011 inspection:

90.     <u>Questionable Total Nitrogen (TKN) & Insoluble Phosphorus Data</u>: "I noted that the insoluble TKN (total Kjeldahl nitrogen) and insoluble phosphorus were reported incorrectly. The permit required the analysis and reporting of insoluble TKN (total Kjeldahl nitrogen) and insoluble phosphorus twice per month during the summer months. The actual reported value was for the dissolved parameters. Apparently, the data had been incorrectly interpreted from their contract laboratory."

91.     <u>Questionable Influent Total Suspended Solids (TSS) & Carbonaceous Biochemical Oxygen Demand (CBOD) Data</u>: "The influent sample was collected with a sump pump sitting inside a plastic garbage can that had the bottom cut off. . . . This makes the previously submitted data for influent total suspended solids and CBOD questionable."

92.     Questionable Dissolved Oxygen (D.O.) Data: "The YSI 54A dissolved oxygen meter is used as both a field instrument . . . and a bench top instrument . . . . However, I did not see the calibration for the field probe performed, nor were there two calibration entries on the calibration log. This makes previously submitted data questionable."

93.     Questionable Carbonaceous Biochemical Oxygen Demand (CBOD) Data: "The effluent dilutions were found to contain insufficient nutrients effectively reducing biological activity during the 5-day incubation period. . . . . This makes previously submitted CBOD data invalid." "Secondary standards are used to calibrate the instrument. I informed the operators that primary standards must be used first . . . . This makes previously submitted data questionable."

94.     Questionable Ammonia as Nitrogen (NH$_3$-N) Data: "I discovered that the operators were under the impression that the distillation step of the procedure was unnecessary. . . . Results will be questionable unless the distillation step is performed or the comparability study demonstrates otherwise."

95.     Questionable Escherichia coli (*E. coli*) Data: "I observed the sample being collected in a beaker then transferred to the sterile/preserved Colilert bottle. This improper sample collection produces questionable results."

96.     In February 2013, TDEC informed Berry's Chapel that it was in violation of its NPDES permit based on the following observations made during a December 2012 inspection:

97.     Questionable Sampling Data: "The composite samples are collected and stored, prior to analyses, in the 20ºC biochemical oxygen demand (BOD) incubator. This could cause the BOD samples to degrade significantly, producing low values."

98.     Questionable Total Suspended Solids (TSS), Carbonaceous Biochemical Oxygen Demand (CBOD), and Influent Flow Data: "The influent composite sample is still being

collected from a sump pump sitting inside a customized plastic tub. . . . The current sampler configuration makes previously submitted data for influent total suspended solids and carbonaceous biochemical oxygen demand (CBOD) results questionable. The plastic tub could also interfere with the accuracy of the influent flow measurement."

99.     Questionable Carbonaceous Biochemical Oxygen Demand (CBOD) Data: "[B]ased on the observations stated above, previously submitted results by the operator should be considered questionable."

100.    TDEC noted that failure to follow EPA approved procedures can lead to inaccurate and unreliable data, which "can lead to degradation of water quality and threats to public health." Berry's Chapel wrote a letter to TDEC explaining the actions it was taking in response to TDEC's letter.

101.    Although Berry's Chapel wrote responsive letters informing TDEC that the causes of the violations had been fixed, it is not known whether all data is currently reliable and all violations have in fact been addressed. For example, in both January 2012 and February 2013 (thirteen months later), TDEC informed Berry's Chapel that previously-submitted data related to Influent Total Suspended Solids ("TSS") and Carbonaceous Biochemical Oxygen Demand ("CBOD") was questionable because the "sump pump [was] sitting inside a plastic garbage can that had the bottom cut off." Therefore, each day that Berry's Chapel failed to properly sample would constitute additional violations.

102.    Each day that Defendant operates its plant without an accurate flow mechanism is a separate violation of its permit and of the Clean Water Act and implicates the effluent limitations and related reporting violations. Such violations are likely to continue.

103.     Plaintiff and its members have suffered damage and continue to suffer damage as a result of Defendant's actions and/or omissions described in this count. These actual and potential injuries have been, are being, and will continue to be caused by the operational violations and discharges from the Berry's Chapel Utility Sewage Treatment without accurate measure for calculating pollutants. The relief sought herein will redress the harms to the Harpeth River Watershed Association and its members caused by Defendant's discharges. Their injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial action to stop the illegal discharges of pollutants into the Harpeth River, to establish accurate measurements, and to comply with such other relief as this Court deems necessary.

## COUNT 5: FAILURE TO DEVELOP OR IMPLEMENT A NUTRIENT MANAGEMENT PLAN

104.     Paragraphs 1-103 are hereby incorporated by reference as if rewritten in their entirety.

105.     Defendant's NPDES permit states that, "Pursuant to the requirements in Attachment 1, the permittee shall develop/implement a Nutrient Management Plan (NMP) with reporting for its wastewater treatment plant." *Berry's Chapel NPDES Permit* § 3.5 (2010).

106.     Defendant has failed to develop or implement a Nutrient Management Plan ("NMP") pursuant to the requirements of Permit § 3.5 and Attachment 1.

107.     In November 2010, Defendant filed a petition for review with the Tennessee Water Quality Control Board and requested amendments to its NPDES permit. *See In the matter of Berry's Chapel Utility, Inc.* (filed Nov. 1, 2010). Defendant appealed permit § 3.5 and "assert[ed] that a twelve month period [rather than a three month period] is necessary for it to

develop an effective Nutrient Management Plan . . . ." (p. 2). *See also* Permit Addendum to Rationale at p. AD-1 (noting permittee objected to timing of NMP).

108.    Appeals must be filed within thirty days after the date that public notice of the permit issuance, denial, or modification is given by way of distribution of the notice of determination to persons who meet the criteria of Rule 1200-04-05-.12(3). Tenn. Comp. R. & Regs. 1200-04-05-.12(5). Berry's Chapel's petition stated that the permit was issued on September 30, 2010, more than thirty days before the appeal was filed. Although the face of the permit indicates that it was issued on October 22, 2010, less than thirty days before the appeal was filed, there is contrary and inconsistent information contained in TDEC's files about when the permit actually issued:

109.    Defendant's appeal was never heard or ruled upon.

110.    Prior to issuing Defendant's current NPDES permit to discharge wastewater into the Harpeth River, TDEC noted that the Harpeth River's designated use for fish and aquatic life was not being fully supported and that Defendant's discharge contained contaminants that contribute to the impairment. Accordingly, TDEC informed Defendant "that it needs to get additional treatment plant effluent characterization data/instream information, and correspondingly have the permittee investigate/implement wastewater treatment plant operational performance enhancements." *Berry's Chapel NPDES Permit (Rationale)*, Page R-2, § R4(e)). Under antidegradation analysis, TDEC noted that the Harpeth River is impaired for dissolved oxygen and phosphorus, Defendant's discharge contains contaminants associated with the decreased receiving stream dissolved oxygen and phosphorus. *Berry's Chapel NPDES Permit (Rationale)*, Page R-9, § R7.14 (2010).

111.    Prior to issuance of the current permit, Defendant requested that the Nutrient Management Plan be due February 15, 2011 "in order to give us more time for preparation and to coordinate with the annual update report. *Berry's Chapel NPDES Permit (Rationale)*, Page AD-1 (2010).

112.    Defendant's permit describes the Nutrient Management Plan, in part, as follows: "The NMP shall be oriented toward identifying the use of its existing facilities (without major capital expenditures) such that changing operations/usages may result in decreases in the discharged treated wastewater total nitrogen and phosphorus." *Berry's Chapel NPDES Permit*, Attachment 1 (2010). Further, Defendant's permit requires it to address seven elements to maximize removal of nitrogen and phosphorus.

113.    Defendant's Nutrient Management Plan was supposed to have been submitted within three months of the permit's effective date. Defendant has also been required to update the report each year by February 15.

114.    Defendant's permit was never amended or modified to remove the duty to develop and implement a Nutrient Management Plan according to Permit § 3.5 and Attachment 1.

115.    Defendant did not prepare or implement a plan pursuant to Permit § 3.5 and Attachment 1, nor did it submit reports related to the Nutrient Management Plan to TDEC in February 2012, February 2013, or February 2014.

116.    Each day Defendant has operated without a Nutrient Management Plan is a separate violation of the permit and of the Clean Water Act, and each failure to report on its Nutrient Management Plan to TDEC is a separate violation of the Clean Water Act.

117.	This violation is likely to continue. In fact, in May 2013, Defendant submitted comments to TDEC that the Nutrient Management Plan requirement is unnecessary. Plaintiff and its members have suffered damage and continue to suffer damage as a result of Defendant's omissions described in this count. These actual and potential injuries have been, are being, and will continue to be caused by the excessive discharges of nutrients from the Berry's Chapel Utility Sewage Treatment Plant and into waters of the United States. The relief sought herein will redress the harms to the Harpeth River Watershed Association and its members caused by Defendant's discharges. Their injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial action to stop the excessive discharges of pollutants into the Harpeth River and to comply with such other relief as this Court deems necessary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court:

118.	Issue service of process issue as authorized by law;

119.	Issue a declaratory judgment stating that Defendant has violated and is continuing to violate the Clean Water Act with its recurring illegal discharges into the Harpeth River;

120.	Order injunctive relief that temporarily and permanently enjoins Defendant from committing any further violations of the Clean Water Act or other applicable laws, requires Defendants to remove or otherwise remedy the discharges and damage to waters of the United States, and ensured that Defendant will come into compliance and remain in compliance with applicable laws and regulations, by ordering that Defendant:

a.	Develop and implement a Nutrient Management Plan;

b. Establish a compliance schedule for limiting overflows, adopt a proactive approach to identifying overflow, and establish a public awareness mechanism for overflows, such as reporting them on Defendant's website;

c. Install new flow meter(s);

d. Establish a uniform protocol for monitoring and sampling;

e. Establish programs to ensure future compliance, such as a Capacity, Management, Operation and Maintenance (CMOM) Programs, like those listed in EPA's § 308 Evaluation: Mapping Program, Grease Control Program, Capacity Assurance Program, Preventative Maintenance and Inspection Programs, Standard operating procedures (SORP) (*e.g.*, Sewage Overflow Response Plan);

f. Order Defendant to conduct additional monitoring to remedy, reduce, or offset the harm caused by its failure to implement a nutrient management plan for the last four years, leaving the State of Tennessee and the public without years' of data to understand the impact of Defendant's past conduct on the Harpeth River;

g. Order Defendant to allow third-party inspection of the operation and testing; and

h. Require Defendant to design and install adequate control technology to abate the continuing discharges of pollutants;

121. Assess civil penalties against Defendant of up to $37,500 per violation per day pursuant to 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. § 19.4, as the Court deems necessary;

122.     Order an award of litigation costs, including reasonable attorneys' fees and expert witness fees, to Plaintiff pursuant to 33 U.S.C. § 1365(d); and

123.     Order such other and further relief as this Court deems just and equitable.

Respectfully submitted this 28TH day of August 2014,

_____
DELTA ANNE DAVIS
BPR No. 010211
Managing Attorney
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, TN 37213
adavis@selctn.org
(615) 921-9470
(615) 921-8011 [Facsimile]

_____
ANNE E. PASSINO
BPR No. 027456
Staff Attorney
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, TN 37213
apassino@selctn.org
(615) 921-9470
(615) 921-8011 [Facsimile]

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this Complaint has been served via electronic mail and first class U.S. mail to:

Henry M. Walker
Bradley Arant Boult Cummings LLP
Roundabout Plaza
1600 Division Street, Suite 700
Nashville, TN 37203

Christopher A. Bowles
Bradley Arant Boult Cummings LLP
Roundabout Plaza
1600 Division Street, Suite 700
Nashville, TN 37203

_____
DELTA ANNE DAVIS